Rick PANNELL, Appellant

v.

Ann SHANNON; and Elegant
Interiors, LLC, Appellees.

No. 2011–SC–000587–DG.

Supreme Court of Kentucky.

March 20, 2014.

Carroll Morris Redford, III, Susan Yuk Wo Chun, Michelle Lynn Hurley, Miller Griffin & Marks, P.S.C., Lexington, KY, for appellant.

Dan M. Rose, Christopher L. Thacker, Stoll Keenon Ogden, PLLC, Lexington, KY, for appellees.

Opinion of the Court by Justice NOBLE.

This case presents two primary questions. First, is the sole member of a limited liability company liable under a lease expressly stating that the company is the tenant even though the lease is the product of a release that does not mention the member's company capacity or the company in any direct way? Second, assuming the member has not directly obligated herself, can she be held personally liable if the lease was entered into while the company was administratively dissolved and was subsequently reinstated? Based on the facts in this case, the member did not directly obligate herself because she clearly signed the lease in her representative capacity and the lease was expressly with the company. And because Kentucky's Limited Liability Company Act provides

for retroactive effect of the reinstatement of an administratively dissolved company, the member continues to enjoy statutory immunity and cannot be personally liable solely by reason of being a member, manager, or agent of the company. Moreover, she cannot be personally liable under the theory that she exceeded her authority as an agent of the company during the dissolution.

## I. Background

Ann Shannon organized Elegant Interiors, LLC in 2000 under the Kentucky Limited Liability Company Act, KRS Chapter 275, and was the company's sole member. In February 2004, Elegant Interiors, LLC entered into a lease for 3,645 square feet of commercial space with Rick Pannell, who owned the property. Shannon signed the lease on behalf of Elegant Interiors, LLC.

In 2005, Elegant Interiors, LLC failed to file its annual report as was then required by KRS 275.190[1] and to pay the $15 filing fee. As a result, on November 1, 2005, the Kentucky Secretary of State ad-

1. This statute and most, if not all, others related to filing business documents with the Secretary of State were repealed in 2011 and were replaced by the omnibus Kentucky Business Entity Filing Act. *See* 2010 Ky. Acts. Ch. 151. The new law, which was codified at KRS Chapter 14A, applies a single system to the filings for most types of business entities, KRS 14A. 1–020, including "corporation[s], business trust[s], partnership[s], limited partnership[s], [and] limited liability compan[ies]," KRS 14A.1–070(7). Before this, the filing procedure for different types of entities was laid out separately in the laws applicable to those entities. *See, e.g.,* KRS 271B. 14–200 (administrative dissolution of corporations); KRS 275.295 (same process for LLCs). Nevertheless, because the events in this case occurred before the repeal, the applicable statutes are those portions of the Kentucky Limited Liability Company Act that were then in effect and have since been repealed, such as KRS 275.295.

There appears to be some confusion, however, as to whether statutes such as KRS 275.295 are presently the law. Both Westlaw and the Legislative Research Commission's website, www.lrc.ky.gov, state that KRS 275.295 has been repealed. At the same time, *Michie's Kentucky Revised Statutes* lists KRS 275.295 as presently the law and does not note the repeal. Yet *Michie's* is a "certified version" of the Kentucky Revised Statutes that has been certified by the Legislative Research Commission under KRS 7.132 to conform to the requirements of KRS 7.134 "that the particular material being certified has been prepared in a manner ... to ensure the identity of its text with the official version of

the Kentucky Revised Statutes." KRS 7.134(3).

This Court's review of several bills enacted into law in the 2010 Regular Session, however, shows that KRS 275.295 and other similar statutes were fully repealed as of January 1, 2011. The laws in question are Senate Bill 150 (2010 Ky. Acts ch. 133); Senate Bill 151 (2010 Ky. Acts ch. 151); and Senate Bill 152 (2010 Ky. Acts ch. 51). Senate Bill 150 amended KRS 275.295 and other statutes. At least some of these amendments appear to have been minor, such as requiring the Secretary of State's notices to be served on an LLC's principal place of business address, rather than its registered office; this bill was enacted on April 13, 2010. Senate Bill 151 repealed KRS 275.295 and other statutes, and replaced them with KRS Chapter 14A, the omnibus business-entity filing bill described above; this bill was passed on April 13, 2010, and became effective on January 1, 2011. Senate Bill 152 repealed and reinstated KRS 275.295 and various statutes; this bill was effective July 15, 2010, and passed on March 30, 2010, a month and a half after Senate Bills 150 and 151.

That *Michie's* still lists the statutes repealed in Senate Bill 151 appears to be a result of the repeal-and-reinstate language in Senate Bill 152. But this ignores other provisions in Senate Bill 152, namely Section 184, which has the following language:

(1) It is the intent of the General Assembly that the repeal and reenactment of sections in this Act shall not serve to void amendments made to those sections by other bills enacted during the 2010 Regular session of the Kentucky General As-

ministratively dissolved Elegant Interiors LLC, as was then allowed by KRS 275.295, by issuing a certificate of dissolution.

In March 2006, the parties negotiated new leasing terms, entering into a release of the old lease and a new lease for less than half the previous space. The release was prepared by Shannon, and was signed on March 2, 2006. It stated:

> I agree to release 1991 SF of my current space and all responsibility of payment for the 1991 SF, located at 148 W. Tiverton Way, STE 140, beginning today, Mar. 2, 2006. The purpose of this release is to grant Rick Pannell the right to lease STE 140 (consisting of 1991 SF) to Dr. Mike Nemastil. It is agreed upon that the signing of this document by both parties assures that Ann Shannon will not be held responsible for the building of any walls, construction, cam costs, or any expenses pertaining to STE 140, beginning today, March 2, 06, and will only be responsible for payment of the remaining 1654 SF @ 18.00 SF [18.856 written by hand above 18.00 and initialed by both parties] and known as STE 150, located at the same address. Upon acceptance of this document, a new lease will be signed by Ann Shannon, for the changes in SF (1654 SF@ 18.00 SF [18.856 written by hand above 18.00 and initialed by both parties] ) and cam costs only for the STE 150. All other stipulations will remain the same as in the initial lease.[2]

The release was signed by both Ann Shannon and Rick Pannell. It does not mention Elegant Interiors, LLC.

---

sembly, regardless of whether this Act is enacted before or after those other Acts.

(2) Notwithstanding KRS 446.100 or 446.260 or any other statute to the contrary, the Reviser of Statutes shall give force and effect to other 2010 Acts that amend one or more sections contained in this Act, and shall codify those amendments in accordance with KRS 446.250 and other applicable rules of codification.

Under this provision, the amendments in Senate Bill 150 were to be made, even though they were passed earlier in the session—before the earlier versions were repealed and then reenacted by Senate Bill 152. And the repeals in Senate Bill 151 were also passed into law and, under Section 184, were to be made to the statutes at the proper time (i.e., January 1, 2011). While we might not initially think of a repeal as an amendment, it must be. "Amend" means "[t]o change the wording of; specif., to formally alter (a statute, constitution, motion, etc.) *by striking out*, inserting, or substituting words <amend the legislative bill>." *Black's Law Dictionary* 89 (8th ed.2004) (emphasis added). Repealing a statute is no different than the striking out of all the language in the statute. Thus, Senate Bill 152 should have taken effect on July 1, 2010, to repeal and reenact various statutes, along with the amendments made in Senate Bill 150. And Senate Bill 151 should have taken effect approximately six months later, on January 1, 2011, to repeal that which has been reenacted by Senate Bill 152 and amended by Senate Bill 150.

Senate Bill 152 appears to have been some sort of clean-up bill. It includes references to making several different amendments retroactive to 2002 or 2007. *See* §§ 180–183. For example, one part, section 183, states that the repeal-and-reenact provisions elsewhere in the bill reflecting amendments that had been made in a 2007 bill are made retroactive to 2007. Why this was necessary is not self evident, but the General Assembly clearly believed it was. Similarly, it is clear that the General Assembly did not intend Senate Bill 152 to undo the amendments (including the repeals) that were to be made at various times at the command of Senate Bills 150 and 151.

Thus, despite the confusion, it is clear to this Court that the amendments made by Senate Bill 152 were only effective until January 1, 2011, at which time all those statutes were repealed by the effect of Senate Bill 151 and replaced by the omnibus Kentucky Business Entity Filing Act.

2. The document was originally written in all-capital letters. For ease of reading, the quoted language has been converted to standard capitalization where possible.

The new lease was also signed on March 2, 2006. Rather than using a new document, the parties used a copy of the original lease and simply wrote new terms over some of the old ones (such as the length of the lease, square footage, and amount of rent) and initialed the changes. The amended lease, like the original lease, stated that the tenant was Elegant Interiors, LLC. Shannon and Pannell signed the document at the end a second time, just above their original signatures. Shannon did not indicate her company title, despite a line for it, but her original signature line was preceded by the word "By."

Despite the reduced cost, the rent payments for June and July of 2006 were not made. Pannell sued for breach of the lease agreement on July 21, 2006. He named both the LLC and Shannon individually, seeking to hold her personally liable for the rent through various theories, including that she had no authority to enter into the lease for the LLC and that the corporate veil of the LLC should be pierced because the company was simply the "alter ego" of Shannon.

Shortly after, Shannon sought to reinstate the administratively dissolved LLC, as was then allowed by KRS 278.295.[3] On August 11, 2006, the Secretary of State issued a certificate of existence for the LLC that, by its own terms, "cancel[led] the certificate of dissolution issued on November 1, 2005."

Shannon then sought summary judgment on the basis that she could not be held personally liable for the breach of the lease because the tenant on the lease was Elegant Interiors, LLC, which had been reinstated. She argued that because she was a member of the LLC, she was shielded from personal liability by KRS 275.150, the statute granting immunity to LLC members for acts of the LLC.

Pannell argued that despite the LLC being named the tenant in the lease, Shannon personally executed the lease, as evidenced by her signature on the release without any reference to the LLC, and thus she entered into the lease in her individual capacity. He also argued that Shannon could not have acted on behalf of the LLC because there was no such entity in existence at the time.

The circuit court disagreed. It held that the LLC, not Shannon individually, had entered into the lease, noting that the lease specifically described the tenant as "Elegant Interiors, a LLC corporation [sic]." As a result, according to the circuit court, the LLC was "the party assuming the obligations of Tenant." As to the secondary argument, the court cited KRS 275.295(3), which stated in part that an LLC's "reinstatement shall relate back to and take effect as of the effective date of the administrative dissolution, and the limited liability company shall resume carrying on business as if the administrative dissolution had never occurred." KRS 275.295(3)(c). The court held that since the lease specifically named the LLC and the reinstatement of Elegant Interiors, LLC occurred before entry of judgment, actions taken in the name of the company in entering into the 2006 lease were effective as if the dissolution had not occurred. As a result, Shannon was entitled to immunity from personal liability. The circuit court then awarded Pannell damages against Elegant Interiors, LLC under the lease.

The Court of Appeals affirmed unanimously, holding that the lease was with the

---

**3.** This statute, like the others concerning business filings with the Secretary of State, was repealed and replaced with a similar statute applicable to multiple classes of business entities. The new version of this statute is KRS 14A.7–030.

LLC and that the administrative dissolution had no effect once the LLC was reinstated. In reaching this conclusion, the court relied in part on one of its own published decisions, *Fairbanks Arctic Blind Co. v. Prather & Associates, Inc.*, 198 S.W.3d 143, 146 (Ky.App.2005), which stated that "reinstatement validates any action taken by a corporation between the time it was administratively dissolved and the date of its reinstatement."

This Court granted discretionary review.

## II. Analysis

This case presents two broad legal questions. First, did Shannon sign the release and lease in her individual capacity, thereby making her personally liable? Second, did the administrative dissolution of the LLC and Shannon's signing the lease during the period of dissolution, regardless of whether she signed in her company-member or individual capacity, make her personally liable?

### A. Shannon did not sign the lease or release in her individual capacity.

■ Pannell's initial argument is that regardless of the status of Elegant Interiors, LLC, Shannon signed the release and the second lease in her individual capacity. To support this argument, he notes that the lease states on its cover page that it is "for Ann Shannon," and that Shannon failed to indicate that her signature was in a representative capacity for the LLC. This, he claims, makes the document ambiguous, and thus subject to clarification through parol evidence. He also argues that the release, which was prepared by Shannon, mentions only Shannon and not the LLC, which would make her personally liable. This Court agrees with the Court of Appeals that Shannon did not sign the March 2006 lease in her personal capacity.

As to the claim that the lease states it is "for Ann Shannon," it suffices to say that the lease defines the "Tenant" as Elegant Interiors, LLC, and throughout its terms refers to the "Tenant" as the party to the lease. The only reference to the lease agreement being "for Ann Shannon" appears on the cover page of the lease, which also states that the "tenant" is Elegant Interiors, LLC.

The cover page is but "introductory or prefatory" material. It had less substance than even the traditional recitals of a contract, which are "not an essential part of the operative portions of the contract." *Jones v. City of Paducah*, 283 Ky. 628, 142 S.W.2d 365, 367 (1940). Like recitals, the statement on the cover page is not an essential part of the operative terms of the lease.

■ As for the claim that Shannon did not include her title or otherwise indicate her representative capacity along with her signature, it is worth noting that her signature line was preceded by the word "By," which indicates that the signature is in a representative capacity. *See* 7 William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Private Corporations* § 3032 (rev.vol.2012) (noting that a representative signature is ideally "preceded by the word 'For' or 'By' or some equivalent"). And the simple fact is that Shannon did not have to list her title, though clearly the better practice is to include it. "[F]ailure of the officers signing to add the title of their office is not ordinarily fatal to the validity of a corporate contract where the contract on its face is a contract of the corporation and the other parties have notice of the officer's relation to the corporation." *Id.* § 3035; *see also Star Supply Co. v. Jones*, 665 S.W.2d 194, 198 (Tex. App.1984) ("The signature of a corporate officer on a contract does not render it his personal contract, where in the body of the

contract, it is purported to be a corporation contract.").[4]

There appears to be no Kentucky case stating this rule. The only cases addressing who is bound by the signature of a business entity's officer or agent are those where the body of the document does not state that the business entity is a party to the agreement and only the signature could so indicate. *See, e.g., Simpson v. Heath & Co.*, 580 S.W.2d 505, 506 (Ky.App. 1979) (construing agreement binding "the undersigned" and signed by corporation's president with "Pres." after his signature). But that is not the situation before this Court, given that the lease expressly states it binds the LLC.

▆▆▆▆ This Court sees no reason to depart from the rule that if the body of the contract states that the agreement is with a corporation or other entity, then the officer or agent signing the agreement has not signed in her individual capacity and cannot be held personally liable solely because of her signature. This makes sense in light of the cases noting that "[i]t is ... fundamental that an officer of a corporation will not be individually bound when contracting as an agent of that corporation within the scope of his employment." *Potter v. Chaney*, 290 S.W.2d 44, 46 (Ky.1956). As long as the third party has notice that the agent is acting on behalf of a principal, "the agent is not liable, generally speaking, for his own authorized acts, or for the subsequent dealings between the third person and the principal." *Id.*

Again, as noted above, the lease describes Elegant Interiors, LLC as the party to be bound as the tenant. This identified Elegant Interiors, LLC as the principal and gave Pannell notice that he was dealing with Shannon as an agent of the company.

There is no ambiguity in the lease, at least none based on the cover-page statement or the fact that Shannon did not indicate that her signature was on behalf of the limited liability company. It is thus clear that the lease was a contract of the limited liability company, not Shannon individually, and therefore Shannon cannot be liable as having signed the lease in her personal capacity.

Pannell also claims that the release, by stating that the bound party was "Ann Shannon" without mentioning Elegant Interiors, LLC, made Shannon personally liable or, at the very least, created ambiguity as to the overall agreement when read with the second lease by misleading him. While the release does state that "Ann Shannon ... will only be responsible for payment of the remaining." square footage, it is equally clear that the release was aimed primarily at giving up some of the rights to occupy commercial space under the original lease, which was with Elegant Interiors, LLC. This is evinced by the use of the word "only," to suggest that the release reduces an existing obligation. The release clearly related to the first lease in that it allowed Pannell to rent some of the space to a third party, reduced the rent to be paid, and put the burden of paying for any construction costs on Pannell.

The last sentence of the terms of the first (and second) lease stated that "[n]o modification to this lease shall be binding unless such modification shall be in writing and signed by the parties hereto." The parties to the original lease were unques-

---

**4.** While these authorities, like many discussed in this opinion, relate specifically to corporations, the rules they embody are equally applicable to other limited liability entities unless otherwise noted. This is especially true where the applicable statutory language is the same, although in different locations, for the various business entities.

tionably Elegant Interiors, LLC and Pannell, and the release was entered into because of this no-modifications-except-in-writing provision. By operation of this provision, Shannon could not have executed the release personally and could only do so on behalf of the LLC. The release cannot be read in a vacuum to be an independent agreement that personally obligated Shannon. In fact, the release said that a "new lease" would be signed and that "[a]ll other stipulations w[ould] remain the same as in the initial lease." This would necessarily include the provision that the lease was with Elegant Interiors, LLC.

■ Ultimately, the release and the second lease must be read in light of the statutory preference for maintaining an LLC member's limited liability. KRS 275.150(2) states that the immunity provision, KRS 275.150(1), can give way "under a ... written agreement," in which "a member or manager may agree to be obligated personally for any of the debts, obligations, and liabilities of the limited liability company." But as this Court has stated, allowing personal liability is "antithetical to the purpose of a limited liability company." *Racing Investment Fund 2000, LLC v. Clay Ward Agency, Inc.,* 320 S.W.3d 654, 659 (Ky.2010). The business statutes of this Commonwealth disfavor personal liability, and even when a member of the company intends to take on such liability, it "must be stated in unequivocal terms leaving no doubt that the member or members intended to forego a principal advantage of this form of business entity." *Id.* The release and second lease do not state in unequivocal terms that Shannon was binding herself personally and foregoing her statutory immunity.

■ As to the notion that the release and second lease could or should be read together to create ambiguity, it suffices to point out that the second lease included what is known as an integration or merger clause. The very last clause of the lease states that "[t]his writing contains the entire agreement of the parties hereto."[5] At least as to items contained in the terms of the lease—such as the amount of rent and who is a party to the agreement—the lease contains the entire agreement.[6] Parol evidence as to the "actual" terms of the lease agreement would not be permissible because "[w]hen the negotiations are completed by the execution of the contract, the transaction, so far as it rests on the contract, is merged in the writing." *Bryant v. Troutman,* 287 S.W.2d 918, 920 (Ky.1956). There is no allegation of fraud or mistake here that would justify reforming the agreement. *See id.; Morguelan v. Nat. Levy Realty Co.,* 311 Ky. 845, 847, 226 S.W.2d 20, 21 (1950). Thus, the second lease is the controlling document with re-

---

**5.** The second-to-last clause states:

 *END OF THE WORLD*
 The occurrence of the end of the world prior to the complete performance by Tenant of the terms, covenants and conditions of this Lease ... shall permit Landlord to accelerate and demand payment for all charges which remain as an obligation of Tenant under this Lease, and Landlord's collection of monies due from Tenant may be pursued by an immediately available procedure. For all purposes hereunder or until Landlord provides notice to the contrary, such notice to be given to Tenant by then prevailing medium of communication.

 Landlord shall be deemed aligned with the Forces of Light and Tenant shall be deemed allied with the Powers of Darkness notwithstanding either party's final ordered placement.

 Under this clause, it is unclear whether St. Peter is an unnamed third party to the lease.

**6.** To the extent that the release addresses other items not included in the lease, such as responsibility for construction costs of fitting up the divided space, the release could be read as a separate agreement and could be controlling.

gard to who is responsible for paying rent and who is otherwise bound under it.

■ Pannell also suggests that the second lease's provision stating that the tenant is Elegant Interiors, LLC was "scrivener's error" and that the intent of the parties was for Ann Shannon to be listed as the tenant. While scrivener's error can be grounds for reforming a contract as the result of mutual mistake, "it is the well-established rule in this state that reformation of an executed contract on the ground of mistake will not be decreed unless the mistake be established by full, clear, and decisive evidence," and "[t]he ground of relief must appear beyond reasonable controversy." *Nichols v. Nichols,* 182 Ky. 18, 205 S.W. 953, 954 (1918); *see also Abney v. Nationwide Mut. Ins. Co.,* 215 S.W.3d 699, 704 (Ky.2006) ("The mutual mistake must be proven beyond a reasonable controversy *by clear and convincing evidence."* (quoting *Campbellsville Lumber Co. v. Winfrey,* 303 S.W.2d 284, 286 (Ky.1957), brackets omitted)). While a mutual mistake as to the identity of one of the parties surely would go to a material term of the agreement, there simply is insufficient proof here to justify finding a scrivener's error.

Nonetheless, "merely finding that [Shannon] signed ... in a[limited liability company capacity] rather than an individual capacity does not dispose of this appeal." *White v. Winchester Land Development Corp.,* 584 S.W.2d 56, 60 (Ky.App. 1979), *overruled on other grounds by Inter–Tel Technologies, Inc. v. Linn Station Properties, LLC,* 360 S.W.3d 152 (Ky. 2012). Pannell's other arguments about the administrative dissolution and Shannon's authority as an agent of the LLC must also be addressed.

**B. What was the effect of the administrative dissolution of the limited liability company and subsequent reinstatement ?**

Pannell also argues that because Elegant Interiors, LLC had been administratively dissolved at the time the second lease was entered into, any liability must fall on Shannon personally, regardless of whether she signed the lease in her individual capacity. Shannon of course argues that the reinstatement of the LLC was retroactive, thus giving the company continuous existence and placing liability on the company alone. This actually presents two different questions. First, did the dissolution strip Shannon of her statutory immunity as a member of the LLC and thereby make her personally liable? Second, was Shannon liable as an agent for the LLC during its administrative dissolution, either by reason of being an agent or because she was without authority to enter into the lease?

*1. Shannon, as a member of the limited liability company, cannot be held personally liable solely by reason of her member status for actions taken during a period of administrative dissolution because the company was reinstated.*

■ This Court concludes that a member of a limited liability company enjoys statutory immunity from liability under KRS 275.150 for actions taken during a period of administrative dissolution so long as the company is reinstated before a final judgment is rendered against the member.

■ Pannell begins by claiming that the "well-established and ancient rule" in Kentucky is that shareholders and officers are personally liable for debts made in the name of a dissolved corporation. He implies that the same rule should extend to limited liability companies. This, however, was "the rule at common law," *Moore v. Occupational Safety and Health Review*

*Com'n,* 591 F.2d 991, 995 (4th Cir.1979), and the common law of business entities has largely been abrogated by the adoption of the various statutes, like the Kentucky Business Corporation Act and the Kentucky Limited Liability Company Act. In fact, "limited liability companies are creatures of statute,' controlled by Kentucky Revised Statutes (KRS) Chapter 275," *Turner v. Andrew,* 413 S.W.3d 272, 275 (Ky.2013) (quoting *Spurlock v. Begley,* 308 S.W.3d 657, 659 (Ky.2010)), not primarily by the common law. To the extent that common law doctrines could arguably govern limited liability companies, the Kentucky Limited Liability Company Act "is in derogation of common law," KRS 275.003(1), and the traditional rule of statutory construction that "require[s] strict construction of statutes which are in derogation of common law shall not apply to its provisions." *Id.* Thus, to the extent the statutes conflict with common law, the common law is displaced.

This Court must therefore first look at the controlling statutory law. The obvious place to start, then, is the source of limited liability in the LLC context, KRS 275.150. That statute grants immunity from personal liability to members, managers, employees and other agents of an LLC, stating in relevant part:

> Except as provided in subsection (2) of this section or as otherwise specifically set forth in other sections in this chapter, no member, manager, employee, or agent of a limited liability company ... shall be personally liable by reason of being a member, manager, employee, or agent of the limited liability company, under a judgment, decree, or order of a court, agency, or tribunal of any type, or in any other manner, in this or any other state, or on any other basis, for a debt, obligation, or liability of the limited liability company, whether arising in contract, tort, or otherwise.... That a

limited liability company has a single member or a single manager is not a basis for setting aside the rule otherwise recited in this subsection.

KRS 275.150(1). Subsection (2) allows liability only if the operating or other written agreement allows a member or manager to agree to become personally liable, which is not the case here, as discussed above.

The question, however, is not whether this immunity exists (obviously, it does), but whether it ceases to apply when the LLC is administratively dissolved and the LLC continues to conduct its business, even though later reinstated. When the events of this case occurred, KRS 275.295 provided that when an LLC is reinstated after administrative dissolution, "the reinstatement shall relate back to *and take effect as of the effective date of the administrative dissolution,* and the limited liability company shall resume carrying on business as if the administrative dissolution had never occurred." KRS 275.295(3)(c) (emphasis added). The plain meaning of the relate-back language is that the company is deemed viable on reinstatement from the point of administrative dissolution onward, which necessarily includes the time of suspension between the date of administrative dissolution and reinstatement.

Reinstatement under the statute literally undoes the dissolution. This is why the Secretary of State was required to "cancel" the certificate of dissolution and issue a certificate of existence. *See* KRS 275.295(3)(a). And that certificate of existence took effect, by statute, retroactively on the date of dissolution.

The Court of Appeals has read the same language that appeared in KRS 255.295, albeit in KRS 271B. 14–220, the statute

relating to corporations,[7] to mean that the "General Assembly ... intended for reinstatement to restore a corporation to the same position it would have occupied had it not been dissolved and that reinstatement validates any action taken by a corporation between the time it was administratively dissolved and the date of its reinstatement." *Fairbanks Arctic Blind Co. v. Prather & Associates, Inc.,* 198 S.W.3d 143, 146 (Ky.App.2005).

The problem is that a conjunctive "and" follows this relate-back language and leads to the language that the company shall "resume carrying on its business as if the administrative dissolution or revocation had never occurred." Absent the word "resume," the meaning of the statute would be unquestionable—if a business entity is reinstated, its entity status is to be deemed seamless, with no loss of identity—just as the Court of Appeals held in *Fairbanks.*

Pannell, however, argues that we cannot ignore the word "resume" in the statute, claiming that it means something different from "continue" and that it necessarily requires that the entity have quit doing business while administratively dissolved. He also cites KRS 275.300, which states that a dissolved LLC "shall continue its existence but shall not carry on any business except that appropriate to wind up and liquidate its business and affairs." KRS 275.300(2).

He also cites a 2–1 unpublished opinion by the Court of Appeals, *Forleo v. American Products of Kentucky,* No. 2005–CA–000196–MR, 2006 WL 2788429 (Ky.App. Sept. 29, 2006), interpreting the same language construed in *Fairbanks.* Again, while that language was in the corporation statute, it was identical to that in the LLC statute. In *Forleo,* the court held that a corporation's shareholders were personally liable for business conducted during a period of administrative dissolution despite the reinstatement statute. In *Forleo,* judgment was entered against the shareholders finding them personally liable. *After* entry of the judgment, the shareholders had the corporation reinstated and moved to have the judgment set aside through the retroactive application of the reinstatement KRS 271B.14–220. Rather than applying laches or a similar theory, the Court of Appeals reasoned that the shareholders had acted in contravention of the provision allowing only "winding up" after dissolution, KRS 271B.14–210(3), making the actions non-corporate in nature. The Court reasoned that the choice of the word "resume" in the statute "necessarily implies that the corporation ceased doing business after dissolution" *Id.* at *2. Therefore, the court reasoned, the acts taken in the interim could not have been corporate acts. Unfortunately, *Forleo* apparently failed to address *Fairbanks,* despite being decided later in time.

With *Fairbanks* and *Forleo,* though only one was a published and therefore precedential opinion, there is an apparent split of opinion in the Court of Appeals. Indeed, another panel of the Court of Appeals has applied *Fairbanks,* in another unpublished decision, to mean that if "reinstatement of a corporation relates back to the effective date of dissolution and oper-

---

**7.** KRS 271B.14–220(3) stated that "[w]hen the reinstatement is effective, it shall relate back to and take effect as of the effective date of the administrative dissolution or revocation and the corporation shall resume carrying on its business as if the administrative dissolution or revocation had never occurred." That we are dealing with the LLC version of the statute does not change the meaning of the language, which was the same for both corporations and LLCs at the time, despite being in different statutes. As noted above, a single statute now governs this area for both LLCs and corporations.

ates as if dissolution never occurred, it naturally follows that the shareholders and officers of such corporation are not individually liable for actions undertaken on behalf of the corporation during its dissolution." *Harshman Const. & Elec., Inc. v. Witte,* 2011–CA–000609–MR, 2012 WL 2471445, at *2 (Ky.App. June 29, 2012).

The statute's inclusion of "resume" does seem to offer some ambiguity. Admittedly, "resume" is ordinarily understood to require an interruption in activities. *See, e.g., Merriam–Webster's Collegiate Dictionary* 999 (10th ed.1997) (defining "resume" to mean "to return to or begin again after interruption" and "to begin again something interrupted").

■ But in interpreting statutes, this Court is required to give effect to all the language in a statute if possible. "No single word . . . is determinative, but the statute as a whole must be considered." *Cosby v. Commonwealth,* 147 S.W.3d 56, 58–59 (Ky.2004) (quoting *County of Harlan v. Appalachian Reg'l Healthcare, Inc.,* 85 S.W.3d 607, 611 (Ky.2002)). Thus, all the language of KRS 275.295 must be considered, and it must be considered in relation to the other statutes in the chapter. The word "resume" must therefore be read in light of the other parts of KRS 275.295(3)(c) that clearly contemplate a seamless existence for the company.

To understand the whole statute, we must look at what happens when the Secretary of State reinstates an administratively dissolved LLC. As noted above, if the requirements of reinstatement are met, then the Secretary of State "shall *cancel* the certificate of dissolution." KRS 275.295(3)(b) (emphasis added). "Cancel"

means "to terminate a promise, obligation, or right." *Black's Law Dictionary* 218 (8th ed.2004). Thus, the certificate of dissolution is undone—voided—and has no effect.

More importantly, the Secretary of State must also "prepare a certificate of existence stating the effective date of reinstatement." KRS 275.295(3)(a). This "effective date" is dictated by KRS 275.295(3)(c), which says that the reinstatement shall "take effect as of the effective date of the administrative dissolution." Thus, the Secretary of State certifies the existence of the corporation as of the date of dissolution, with the net effect that the corporation was never suspended.[8] This is consistent with the language in KRS 275.300(2) stating that a limited liability company "shall continue its existence" even while dissolved if it has not wound up its affairs, and even though it is barred from carrying on ordinary business.

So what then is the effect of reinstatement? The company, of course, "resumes" its business. But the reinstatement "relate[s] back to and take[s] effect as of the effective date of the administrative dissolution," and the company "resumes" its business "as if the administrative dissolution had never occurred." KRS 275.295(3)(c). This other language cannot be ignored, nor can "resume" be read to trump it. To do so would effectively delete this other language, which anticipates that the company has a seamless existence and functionality. Giving effect to that language, however, does not ignore or elide "resume"; rather, it suggests that "resume," as used in this

---

**8.** Here, the Secretary of State, either because of a clerical error or misreading of KRS 275.295(3)(c), erroneously stated that the "effective date of reinstatement is August 11, 2006," which was the date the certificate was issued, not the date of dissolution. This error, however, cannot change the legislative command as to when the reinstatement is effective.

context, is more akin to "continue," [9] which is an accepted sense of the word. *See, e.g., Compact Oxford English Dictionary* 763 (2d ed.1991) (noting "resume" can mean "to continue"). And "continue" is often used to describe action without interruption. This reading is the only way to give effect to the entire provision. This means that under the statute, "the existence of the LLC is not interrupted, and it is as if the administrative dissolution never took place." Thomas E. Rutledge & Lady E. Booth, *The Limited Liability Company Act: Understanding Kentucky's New Organizational Option*, 83 Ky. L.J. 1, 38 n. 179 (1995).[10]

Indeed, the Court of Appeals, in *Fairbanks*, addressed the argument that a court should "focus solely on the word 'resume' found in KRS 271B.14–220(3) and construe the statute to disavow interim corporate activities." *Fairbanks*, 198 S.W.3d at 147. That court declined to follow this interpretation, stating:

> This would effectively redact the statute to read, "When the reinstatement is effective ... the corporation shall resume carrying on its business[.]" However, as noted above, we may not subtract language from a statute nor may we render any of its language meaningless, if we can avoid doing so.

**9.** Indeed, the present version of the statute, KRS 14A.7–030(3)(b), states that the entity "shall *continue* carrying on its business," rather than "shall resume."

**10.** Pannell points out that Thomas Rutledge is a partner in the firm representing Shannon and suggests as a result that his scholarly writings and work with the General Assembly in passing various business laws should be ignored by this Court. But Mr. Rutledge is known as an expert in the field, and his scholarly writings quoted and referenced are not about this case (some, in fact, were written years before the dispute even arose). His writings therefore remain persuasive authori-

*Id.* (alteration and omission in original). Instead, the court gave effect to the language following "resume," which requires acting "as if the administrative dissolution ... had never occurred" and treating the effective date of reinstatement as the date of the dissolution. *Id.* at 146.

■■■ That this is the proper reading of KRS 275.295 is buttressed by subsequent amendments and enactments of the General Assembly in this area. "Where a former statute is amended, or a doubtful meaning clarified by subsequent legislation ... such amendment or subsequent legislation is strong evidence of legislative intent of the first statute." *Kotila v. Commonwealth*, 114 S.W.3d 226, 238 (Ky.2003) (quoting 2B Norman J. Singer, *Sutherland Statutory Construction* § 49:11, at 120–21 (6th ed.2000)), *abrogated on other grounds by Matheney v. Commonwealth*, 191 S.W.3d 599 (Ky.2006). This is part of the canon of construction requiring statutes to be read *in pari materia. See id.* ("If it can be gathered from a subsequent statute *in pari materia* what meaning the legislature attached to the words of a former statute, they will amount to a legislative declaration of its meaning, and will govern the construction of the first statute." (quoting *California Sch. Township, Starke Cty. v. Kellogg*, 109 Ind.App. 117, 33 N.E.2d 363, 366 (1941))).[11]

ty to the extent they are persuasive. Indeed, as explained below, this Court disagrees with them as to some of the issues in this case.

**11.** This is a broadly used canon of construction. *See, e.g., Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 596, 100 S.Ct. 800, 814, 63 L.Ed.2d 36 (1980) ("[W]hile the views of subsequent Congresses cannot override the unmistakable intent of the enacting one, such views are entitled to significant weight, and particularly so when the precise intent of the enacting Congress is obscure." (internal citations omitted)); *Fed. Hous. Admin. v. Darlington, Inc.*, 358 U.S. 84, 90, 79 S.Ct. 141, 145, 3 L.Ed.2d 132 (1958) ("Subse-

At least one statute was changed in response to *Forleo*, even though it was not binding precedent. KRS 271B.14–050, which states what dissolution of a corporation shall not do (e.g., shall not transfer title of corporate property), was amended in 2007—the next regular session after *Forleo*—to add a provision stating that dissolution "shall not ... [a]bate or suspend KRS 271B.6–220." KRS 271B.14–050(2)(i); *see* 2007 Ky. Acts ch. 137, § 68 (effecting the change). KRS 271B.6–220 is the statute limiting the liability of corporate shareholders, which, under KRS 271B.14–050(2)(i), is not abated or suspended by dissolution. This change was "in response to" *Forleo*. Thomas E. Rutledge, *The 2007 Amendments to the Kentucky Business Entity Statutes*, 97 Ky. L.J. 229, 243 (2009).

This change alone undermines the claim in *Forleo* that actions during a period of administrative dissolution can lead to personal liability for a shareholder. The General Assembly, by making this change, has expressly stated that limited liability for shareholders is to continue despite an administrative dissolution.

The limited-liability-company analog to the corporate statute, KRS 275.305, was also changed in 2007 so that it too states that dissolution "shall not ... [a]bate or suspend KRS 275.150(1)." KRS 275.305(3)(i); *see* 2007 Ky. Acts ch. 137, § 120 (amending the statute). KRS 275.150(1), of course, is the provision giving immunity to a limited liability company's members, managers, and employees. This amendment of the limited-liability-company statute clarified the intent of the legislature as to the effect of dissolution on the liability of a limited liability company's members, just as the similar change did for corporate shareholders.

In fact, this matter has been further clarified by the adoption of the Kentucky Business Entity Filing Act, which replaced KRS 275.295 and similar statutes, as described above. That relevant portion of that Act states:

When the reinstatement is effective:

(a) It shall relate back to and take effect as of the effective date of the administrative dissolution;

(b) The entity shall continue carrying on its business as if the administrative

quent legislation which declares the intent of an earlier law is not, of course, conclusive in determining what the previous Congress meant. But the later law is entitled to weight when it comes to the problem of construction."). In fact, these cases were quoted and relied upon in *Kotila v. Commonwealth*, 114 S.W.3d 226, 238 (Ky.2003). While they show that this doctrine is not unlimited, they nevertheless show that it is a well-accepted tool in statutory interpretation.

In fact, the perhaps most recent treatise on the subject agrees that it is valid, stating: "It is a logical consequence of this contextual principle [of construing statutes *in pari materia*] that the meaning of an ambiguous provision may change in light of a subsequent enactment." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 254–55 (2012). The limit, of course, is

that this approach is inapplicable "when the ambiguous provision has already been given an authoritative judicial interpretation ... by reason of the principle of stare decisis, which has special force in statutory cases." *Id.* at 255. "The legislature, naturally, can change the law whose meaning the prior judicial interpretation has established. But once the meaning *has* been established, the meaning cannot change 'in light of' a later statute with which a different meaning would be compatible." *Id.* There so far has been no authoritative judicial interpretation of the meaning of this language that would suggest that Pannell's interpretation is correct. In fact, the only published decision actually supports that idea that Shannon should be immune from liability and is in accord with the subsequent amendment to the law.

dissolution or revocation had never occurred; and

(c) The liability of any agent shall be determined as if the administrative dissolution or revocation had never occurred.

KRS 14A.7–030(3). This new statute substitutes "continue" where the old statute stated "resume."

Pannell argues that these changes are not evidence of what the statute formerly meant but instead show that his reading is correct, especially if the changes were necessary to correct the law in response to *Forleo*. That argument, however, ignores the *in pari materia* canon discussed above. This is not a matter of retroactive application of an entirely new statutory provision; rather, it is an application of old language, the meaning of which has been clarified by more recent amendments. The canon is a guide to meaning, not a substitute for it or a means of retroactively applying a statute. We have only used it as a guide here.

There is some concern that this reading of the statute ignores other aspects of the limited-liability laws, namely the command that a dissolved company "shall not carry on any business except that appropriate to wind up and liquidate its business and affairs." KRS 275.300(2). There is, admittedly, some apparent conflict between this language and the notion that a company's member or employee could go about non-winding-up business during an administrative dissolution and later enjoy immunity for those actions if the company has been reinstated. Nevertheless, this concern is unconvincing for several reasons.

First, this view would treat "actions after administration dissolution and prior to reinstatement that are beyond those necessary or appropriate to winding-up and liquidation as ultra vires and . . . then hold the shareholders . . . liable personally on ultra vires obligations." Rutledge, *supra*, at 240–41. But this ignores the rule that the only parties with standing to challenge an act as ultra vires are insiders (members or shareholders) and, in some circumstances, the Attorney General, not third parties doing business with the company. *See* KRS 271B.3–040(2). In fact, with corporations, third parties are statutorily barred from challenging a corporation's acts as ultra vires. *See* KRS 271B.3–040(1). While no analogous statute exists for limited liability companies, it stands to reason that third parties also should not be able to challenge an LLC's act as ultra vires as they have no interest in the dispute. Such a third party would thus have no standing.[12] Even if such a party could challenge the act, it could at most nullify the act, not use the claim as a tool to then pierce the veil of limited liability to reach the individual members.

Second, it does not make sense to enforce the winding-up-only limits on an LLC if it is not intended to be wound up and instead is meant to be a going concern. It is logical to view the language "carry on any business except that necessary to wind up and liquidate" as applying to companies that will not be seeking reinstatement. This is a sound principle, because it serves to prevent further acts by a business that does not intend to continue as a business entity. Even then, the Limited Liability Company Act allows that the LLC can be bound by non-winding-up acts under certain circumstances. *See* KRS 275.305(1)(b).

12. Of course, if the third party is harmed or about to be harmed by the act, that injury or potential injury could be the source of standing. But the nature of such a challenge would not be that the action was ultra vires.

More importantly, the statutes anticipate that some companies will be administratively dissolved and later reinstated. Reinstatement can only occur if a member or agent of the LLC files papers with the Secretary of State. Reinstatement is a statutory process, which does not involve discretion on the part of the Secretary of State; if the applicant meets the statutory requirements, then the Secretary *shall* cancel the dissolution and issue a certificate of existence. But the filing of such paperwork is not part of winding up, and thus should be forbidden by the winding-up-only language if read strictly. If that were correct, then a company could never file for reinstatement. Thus, it is equally logical to read the winding-up-only limit as applying only to an entity that intends to wind up its affairs.

Additionally, there are some actions that must be taken during the dissolution before reinstatement to preserve the business of the company that plans to continue. It is a sound principle to allow ratification of acts of a company that intends to continue its entity status, so that the company may not avoid statutory and other regulation for the period of time it was under dissolution. This avoids a company purposely using dissolution to avoid legal restrictions on its conduct.

Since limited liability companies do not actually cease to exist during dissolution, it makes sense that the language about "relating back" and "as if the administrative dissolution or revocation had never occurred" is intended to create a seamless functional existence when the company wishes to continue doing business rather than closing up shop. Thus to read excessive meaning into the term "resume" would result in a poor business rule. That one word cannot mean more than the rest of the statutory language put together; it must be read to serve the business purpose intended by the legislation.

Pannell also argues that we should reject Shannon's immunity claim because the reinstatement statute is silent as to the issue of personal liability. He is correct that the statute is silent, but that silence cuts both ways. Just as the statute does not say that shareholders are still immune, it does not say they lose their immunity. Yet, as discussed above, our statutory and case law strongly favors maintaining limited liability for corporate shareholders and limited-liability-company members. *See Racing Investment Fund 2000, LLC v. Clay Ward Agency, Inc.*, 320 S.W.3d 654, 659 (Ky.2010). Immunizing this constituency from personal liability promotes entrepreneurship, and increases the number of persons willing to engage the risks of entering into business. Additionally, there is no question that "a limited liability company is a legal entity distinct from its members," KRS 275.010(2); *see also Turner v. Andrew*, 413 S.W.3d 272, 275 (Ky. 2013), and that a member of a limited liability company "shall not be a proper party to a proceeding by or against a limited liability company, solely by reason of being a member of the limited liability company," KRS 275.155; *see also Turner*, 413 S.W.3d at 275–76. This is the case "even where there is only one member." *Turner*, 413 S.W.3d at 276.

Statutes like KRS 275.150, 275.010, and 275.155 strongly suggest that the seeming gap in the reinstatement statute stemming from its silence on the issue of personal liability is filled by the strong policy in favor of limited liability. That the reinstatement statute does not include a provision expressly placing personal liability on various corporate *dramatis personae* during a period of dissolution is telling. Indeed, some other states have done exactly that. For example, Florida's administra-

tive dissolution statute is almost identical to Kentucky's, except it has a provision stating that a director, officer, or agent of an administratively dissolved corporation is personally liable if he or she purports to act for the corporation during dissolution. *See* Fla. Stat. Ann. § 607.1421(4).[13] Kentucky has no such provision, even though the General Assembly could easily have included one. Instead, the General Assembly only enacted language providing for the continuous existence of the company and retroactive effect of reinstatement, along with an express grant of immunity from liability. This statutory scheme must be given effect as a whole.

 To elevate the "resume" language over the rest of KRS 275.295, as happened in *Forleo*, undermines this strong preference for limited personal liability. It would also allow functional piercing of the corporate veil[14] based on what amounts to little more than "a lack of attention to corporate formalities," Thomas E. Rutledge, *The 2007 Amendments to the Kentucky Business Entity Statutes*, 97 Ky.

L.J. 229, 240 (2009), which is but one in a long list of factors to consider in the veil-piercing context, *id.; see also Inter–Tel Technologies, Inc. v. Linn Station Properties, LLC*, 360 S.W.3d 152, 163 (Ky.2012). Yet "[i]t is fundamental corporate law that a shareholder is not liable for a debt of the corporation unless *extraordinary circumstances* exist to impose liability." *Morgan v. O'Neil*, 652 S.W.2d 83, 85 (Ky.1983) (emphasis added); *see also Schultz v. General Elec. Healthcare Financial Services Inc.*, 360 S.W.3d 171, 174 (Ky.2012) ("[A] court will disturb the legal fiction of corporate separateness only in the rarest of circumstances."); *White v. Winchester Land Development Corporation*, 584 S.W.2d 56, 62 (Ky.App.1979) ("Generally speaking, the corporate veil should only be pierced 'reluctantly and cautiously' . . . ."). Surely a temporary, unintentional dissolution is not an extraordinary circumstance. The same fundamental law limiting veil piercing to extraordinary circumstances must apply to limited liability companies as well.[15]

13. The provision states:
> A director, officer, or agent of a corporation dissolved pursuant to this section, purporting to act on behalf of the corporation, is personally liable for the debts, obligations, and liabilities of the corporation arising from such action and incurred subsequent to the corporation's administrative dissolution only if he or she has actual notice of the administrative dissolution at the time such action is taken; but such liability shall be terminated upon the ratification of such action by the corporation's board of directors or shareholders subsequent to the reinstatement of the corporation under ss. 607.1401–607.14401.

Fla. Stat. Ann. § 607.1421. Interestingly, even this statute does not extend liability to a shareholder, but instead extends the liability only to agents of the corporation. It also allows for ratification of those actions, which transfers the liability back to the corporation.

14. The term "corporate veil" is used, despite an LLC being a different type of entity from a

corporation, because the doctrine grew out of corporate law. Nevertheless, "[f]or liability purposes, a limited liability company (LLC) should be subject to the same treatment as a corporation." 51 Am.Jur.2d *Limited Liability Companies* § 16 (updated 2013).

15. This, of course, assumes the doctrine of veil piercing even applies to limited liability companies under Kentucky law. While several decisions have assumed that it does, *see Stettenbenz v. Butch's Rod Shop, LLC*, 2012–CA–001405–MR, 2013 WL 4779862 (Ky.App. Sept. 6, 2013) (unpublished), the question appears to have been raised in only one case, *Howell Contractors, Inc. v. Berling*, 383 S.W.3d 465, 466 (Ky.App.2012), which ultimately avoided the question by applying Ohio law, which does allow veil piercing of LLCs. There are, of course, strong arguments for why LLC veil piercing should not be allowed, *see generally* Stephen M. Bainbridge, *Abolishing LLC Veil Piercing*, 2005 U. Ill. L.Rev. 77 (2005), even when corporate veil piercing is

The strong principle of favoring limited liability informs our understanding of the law applicable to limited liability companies. From it, we can even more readily conclude that the legislature intended the relation-back, effective-date, and as-if-the-administrative-dissolution-had-never-occurred language to create a seamless company functionality that protects the members of the LLC from personal liability for actions occurring during a period of administrative dissolution, as long as reinstatement occurs. And, despite the suggestion otherwise in *Forleo,* this would comport with the general rule in most jurisdictions that business-entity owners (usually shareholders of a corporation but sometimes, as in this case, members of a limited liability company) are not personally liable for actions during a period of dissolution followed by reinstatement. *See* 16A William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Private Corporations* § 8130, at 282–83 (rev.vol.2012) ("[T]he reinstatement of a corporation following dissolution by administrative action of the state ordinarily relates back to the

effective date of its dissolution or suspension. Thus, shareholders of a reinstated corporation generally are not liable for actions undertaken during a period of dissolution or suspension.").[16]

As noted above, this analysis applies to Shannon's liability as a member of the LLC. But Pannell's objection appears to actually be that Shannon is liable as an officer or agent of the corporation who acted without authority. Indeed, this makes sense, as a corporate shareholder or LLC member, while an owner, is not necessarily an agent of the business entity, at least not simply by reason of being an owner.[17]

Pannell's reliance on *Forleo* is telling in this respect, as one of the major criticisms of the analysis in that case (but not necessarily the result) is that "it conflated the role of the shareholder, who lacks the authority to act on behalf of or to bind the corporation, with the roles of a director and an officer which, respectively, has the authority to direct the management of the corporation and the authority to bind the

viable in the jurisdiction, *see* Thomas E. Rutledge & Lady E. Booth, *The Limited Liability Company Act: Understanding Kentucky's New Organizational Option,* 83 Ky. L.J. 1, 17 n. 73 (1995) ("An issue to be considered is the degree to which the common law doctrine of piercing the corporate veil should apply to LLCs. While the use of the LLC's liability shield should not be permitted to protect wrongdoers, the application of the law that has developed in this area is questionable.").

16. Fletcher notes that "some states" follow a different rule and allow personal liability. 16A William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Private Corporations* § 8130, at 282–83 (rev.vol.2012). But these states largely appear to be ones that do not provide for retroactive effect of reinstatement. *See, e.g., T–K Distributors, Inc. v. Soldevere,* 146 Ariz. 150, 704 P.2d 280, 282 (Ariz.Ct.App. 1985) (applying statute from which language giving retroactive effect to reinstatement had been removed).

17. Under Kentucky law, LLC members are agents of the LLC by default, *see* KRS 275.135(1), but they do not have to be. Instead, the LLC can be managed by a manager or managers, in which case "[n]o member, solely by reason of being a member, shall be an agent of the limited liability company." KRS 275.135(2)(a). It is unlikely that Shannon employed a manager, as she conducted the company's affairs herself. But the distinction between liability arising because of a member's status as a member or an agent is important because it avoids "doing violence to the application of the limited liability shield enjoyed by [members]." Thomas E. Rutledge, *The 2007 Amendments to the Kentucky Business Entity Statutes,* 97 Ky. L.J. 229, 243 n. 95 (2009). It also matters because an LLC's agent cannot be liable solely by reason of being an agent. KRS 275.150(1).

corporation to third parties." Thomas E. Rutledge, *The 2007 Amendments to the Kentucky Business Entity Statutes,* 97 Ky. L.J. 229, 241 (2009) (footnote citations omitted). (Even *Forleo* phrased its rule at one point as applying to the liability of corporate *officers,* and its discussion of a majority rule, discussed more below appears to stem from cases involving the liability of officers and other agents rather than owners. *See Forleo,* 2006 WL 2788429, at * 1.) That this is really Pannell's claim is further shown by the two cases he cites at the outset of his argument about Shannon's lack of LLC protection, both of which concern the liability of an *agent* acting without or beyond her authority. *See Steele v. Stanley,* 237 Ky. 517, 35 S.W.2d 867 (1931); *Oliver v. Wyatt,* 418 S.W.2d 403 (Ky.1967).

But the liability of a director, officer, employee or other agent of a limited liability entity during a period of administrative dissolution is technically a separate question from the liability of the owners of the entity. Indeed, as noted above, the cases Pannell relies on, and the majority rule those cases allege exists, are about the liability of directors, officers and other agents, as distinct from the owners (e.g., shareholders and members) of a business entity. Those cases sometimes also place liability on owners, but they do so because those owners were also acting as agents of the companies in question. And not only is it a separate question, it is often a different question, since the immunity from liability for these two groups often stems from different places, with the immunity for owners stemming from statute, *see, e.g.,* KRS 271B.6.220 (limiting liability of corporate shareholders), and the immunity of directors, officers, and other agents, at least for contractual obligations, stemming from the law of agency, *see, e.g., Restatement (Third) Of Agency* § 6.01 (2006). .

That the liability questions are separate is easily shown by a situation where the owner (member) is a different person from the agent, but the act in question was that of the agent. It is further shown by the fact that a business entity can only act through an agent. Clearly, the agent's personal liability for that act does not dictate whether the owner is personally liable. This case is analytically difficult in part because Shannon is both a member (owner) and manager (agent) of Elegant Interiors, LLC. But a member's immunity cannot be set aside solely because the "limited liability company has a single member or a single manager." KRS 275.150(1). Shannon's potential liability as an agent of Elegant Interiors, LLC is therefore addressed separately below.

### 2. Shannon is not liable as an agent of the limited liability company.

This is the most difficult of the questions raised by this case, in part because it was not the focus of the litigation, or at least the decision, at the trial court. This question, however, again breaks down into multiple sub-questions. First, can Shannon under the circumstances of this case be personally liable by reason of her merely being an agent? Second, can she be personally liable because she acted as an agent without authority?

### a. Shannon is not liable simply because she was an agent of the limited liability company.

▮ The analysis above about liability of members also applies to agents of the limited liability company, to the extent their liability is alleged to exist simply by reason of their being agents, at least under the statute in effect when the events in this case occurred. Unlike the corporation limited-liability statute, the statute granting immunity to members of a limited lia-

bility company also grants the same immunity to a "manager, employee, [and] agent of a limited liability company" to the extent that the claimant alleges the person is "personally liable by reason of being a . . . manager, employee, or agent of the limited liability company . . . for a debt, obligation, or liability of the limited liability company, whether arising in contract, tort, or otherwise." KRS 275.150(1). To the extent that any liability is claimed solely because Shannon was a manager or agent of the LLC, the analysis above for why she cannot be liable as a member applies. The reinstatement is retroactive to the date of dissolution, and it is as if the dissolution never occurred, giving the company a seamless existence. The limitation on the agent's liability simply for being an agent is likewise seamless.

But it is when talking about the liability of agents that *Forleo* offers one last objection to this reading of the LLC reinstatement statute, namely, that this interpretation will place Kentucky in a minority position with regard to the effect of reinstatement as to the liability of officers and agents. *Forleo* interpreted language in a corporation reinstatement statute identical to that in the LLC reinstatement statute. In construing the effect of the corporation reinstatement statute, *Forleo* stated: "A majority of other jurisdictions considering this issue have found that reinstatement of the corporation does not shield the officers from personal liability for debts incurred after dissolution." *Forleo,* 2006 WL 2788429, at * 1. In support of this conclusion, it cited *Cardem, Inc. v. Marketron International,* 322 Ill.App.3d 131, 255 Ill.Dec. 376, 749 N.E.2d 477 (2001), and *WorldCom, Inc. v. Sandoval,* 182 Misc.2d 1021, 701 N.Y.S.2d 834 (N.Y.Sup.Ct.1999). But neither of these cases stands for precisely the proposition claimed.

In *Cardem,* the defendant was the shareholder and president of the corporation, and was held liable. That decision was "based . . . on a survey of the opinions of other jurisdictions that had addressed this question and agree[ment] with those that imposed personal liability on such an officer." *Cardem, Inc.,* 255 Ill.Dec. 376, 749 N.E.2d at 480. It did not suggest that it followed a majority rule, only that it agreed with those cases imposing liability. Moreover, *Cardem* was based largely on an Illinois statute expressly making directors of a corporation liable for debts incurred during dissolution. *See id.* ("The directors of a corporation that carries on its business after the filing by the Secretary of State of articles of dissolution, otherwise than so far as may be necessary for the winding up thereof, shall be jointly and severally liable to the creditors of such corporation for all debts and liabilities of the corporation incurred in so carrying on its business." (quoting 805 Ill. Comp. Stat. 5/8.65(a)(3) (West 1998))). Kentucky does not have a statute like this one.

*WorldCom* at least claimed there is a "majority rule . . . that 'the officer may be held personally liable for debts incurred by the continuation of business of the dissolved corporation, regardless of the corporation's subsequent reinstatement.' " *WorldCom, Inc.,* 701 N.Y.S.2d at 837. But this so-called majority rule appears to be the case only where the statutory scheme speaks specifically to the liability of the directors or other officers, as happened in *Cardem.* For example, *WorldCom* cited as one of its examples *Moore v. Occupational Safety and Health Review Com'n,* 591 F.2d 991, 994 (4th Cir.1979), but that case involved a Virginia statute specifically stating that "upon the entry by the Commission of an order of reinstatement, the corporate existence shall be deemed to have continued from the date of dissolution *[e]xcept that reinstatement shall have no*

*effect on any question of personal liability of the directors, officers or agents in respect of the period between dissolution and reinstatement." Id.* (quoting Va.Code Ann. § 13.1–92 (1950)) (emphasis added). Again, Kentucky has no such statute.

Interestingly, the *Moore* court noted that there was a "contrariety of judicial opinion" on the subject, though it ultimately concluded that a majority of states had followed the common-law rule of holding directors liable for interim acts. But it then stated that "the effect of a state reinstatement statute on the interim liability of the directors of a dissolved corporation is determined by the appropriate state's interpretation or construction of the statute providing for the reinstatement or revival." *Id.* at 995 (citation footnote and quotation mark omitted). Thus, a different statute can dictate a different result. And, as noted above, Kentucky has largely replaced its common law of business entities with statutes, and those statutes differ from those in some other states, such as Illinois.

*WorldCom* is thus distinguishable from this case because it was based on New York statutes that do not provide expressly for retroactive effect of the reinstatement, though they state that reinstatement "shall have the effect of annulling all of the proceedings theretofore taken for the dissolution" and the corporation "shall thereupon have such corporate powers, rights, duties and obligations as it had on the date of the publication of the proclamation [of dissolution], with the same force and effect as if such proclamation had not been made or published." N.Y. Tax Law § 203–a(7), *construed in WorldCom, Inc.* 701 N.Y.S.2d at 837. *WorldCom* also relied heavily on *Poritzky v. Wachtel,* 176 Misc. 633, 27 N.Y.S.2d 316, 318 (N.Y.Sup.Ct.1941), which focused on the danger that corporate

agents could use reinstatement to fraudulently shift personal debts to a corporation.

But in this light, it is not even clear that *WorldCom* or *Poritzky* correctly state New York law. First, both cases are decisions by trial courts deciding summary judgment motions, not appellate decisions. And as another, more recent New York trial court has noted, "[s]eductive though it may be, the *Poritzky* rationale is fallacious." *Department 56, Inc. v. Bloom,* 186 Misc.2d 901, 720 N.Y.S.2d 920, 922 (N.Y.Sup.Ct.2001). That court went on to describe how there are no incentives to engage in the type of behavior bemoaned in *WorldCom* and *Poritzky,* and that there were in fact several disincentives. *Id.* at 923. For that reason, *Department 56* declined to read New York law to create personal liability, holding that "the state itself imposes no personal liability upon offending corporate officers or directors." *Id.*

Second, as one federal court has stated, *WorldCom* and *Poritzky* ignored "the literal language of the statute" in question. *Nigro v. Dwyer,* 438 F.Supp.2d 229, 235 (S.D.N.Y.2006). At best, based on *Nigro's* review of the relevant case law, there appears to be "a fraud exception to the literal language of the [New York] Tax Law." *Id.* at 236. But there is no allegation of fraud here. (Pannell's suggestion that he was misled by the release's use only of Ann Shannon's name does not rise to the level of fraud, especially given that the lease clearly stated that the LLC was the tenant.)

The simple fact is that Kentucky's corporation law and other business entity laws differ from those in other states. Additionally, many of the decisions establishing or proclaiming the "majority rule" are older decisions, depend on statutes different from Kentucky's, and may not reflect the current statutory law in those

jurisdictions. In fact, according to *Fairbanks*, "[t]he majority rule among [states with reinstatement statutes that are silent regarding a dissolved corporation's interim acts] is that reinstatement *validates* a dissolved corporation interim acts." *Fairbanks*, 198 S.W.3d at 144 (emphasis added). As to Pannell's argument that *Fairbanks* was not about personal liability to a third party, and is thus distinguishable, other authorities clarify that this "majority rule" applies to such liability:

> In most jurisdictions, the reinstatement of a corporation following dissolution by administrative action of the state relates back to the effective date of dissolution, and directors or officers are not personally liable for actions taken during the period of dissolution or suspension. Such matters become the exclusive liability of the corporation.

16A William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Private Corporations* § 8117, at 250 (rev.vol.2012).[18]

The existence of a majority rule can only be persuasive if the rule is based on statutes like those in Kentucky. We cannot say that our statutes expressly state who is liable for a company's debts while under dissolution as is the case in some states. *See, e.g., Frederic G. Krapf & Son, Inc. v. Gorson*, 243 A.2d 713, 715 (Del.1968) (interpreting statute "provid[ing] that upon reinstatement of a charter all contracts and other matters done and performed by the corporate officers during the time the charter was inoperative shall be validated, and be the exclusive liability of the corporation"). But they also do not expressly extend personal liability to officers and agents of a business entity when they act during a period of dissolution.

■ At best, the dissolution and reinstatement statutes are silent as to the question of personal liability. Yet we are charged with determining the effect of the reinstatement statute, which as noted above expressly makes the reinstatement retroactive, in the context of all the other statutes, such as those creating and favoring limited liability. The retroactivity of the reinstatement statute, when read with the provision making the company exist even after dissolution and the statutes creating immunity for agents, makes an agent immune if personal liability is alleged solely because the agent is an agent.[19]

*b. Shannon cannot be held personally liable as an agent who acted without or beyond her authority because her authority never lapsed.*

■ That said, the thrust of Pannell's argument is really that Shannon acted on her own behalf, not for the limited liability company, and without authority to do so. Part of this claim—that Shannon signed the lease not in her representative capacity, but in her personal capacity—has been addressed above. Whether Shannon actu-

---

**18.** Again, Fletcher notes that "some states" follow a different rule and allow personal liability. 16A Fletcher, *supra*, § 8117. But again these states largely appear to be ones that have substantially different statutory schemes, *e.g., Moore v. Occupational Safety and Health Review Com'n*, 591 F.2d 991, 994 (4th Cir.1979), or are concerned with fraud, *e.g., Nigro v. Dwyer*, 438 F.Supp.2d 229, 235 (S.D.N.Y.2006).

**19.** It is worth noting that the LLC-immunity statute does not extend immunity to an agent's individual wrongful acts. Specifically, the statute states that the immunity-granting provision "shall not affect the liability of a member, manager, employee, or agent of a limited liability company for his or her own negligence, wrongful acts, or misconduct." KRS 275.150(3). Of course, there are no allegations of negligence or wrongful acts: Pannell has simply alleged that Shannon was in violation of the lease agreement, which makes this a simple contract dispute.

ally had authority to enter into the lease when the company was administratively dissolved is a close question, but ultimately this Court concludes that she did have such authority because of the retroactive effect of the reinstatement statute.[20]

Again, this is a separate question from whether Shannon can be liable solely by reason of being an agent. The immunity provided by KRS 275.150 extends only to liability *by reason* of her being an agent. By alleging that Shannon acted without authority, Pannell is not claiming she is liable solely because of her status as an agent, but because she had no authority to act as an agent.

■ Business entities, as legal fictions, can only act through their agents, and the law of agency dictates when an agent or a principal is bound by a transaction and whether the agent is therefore personally liable.[21] While various provisions of the Limited Liability Company Act address how the law of agency operates with respect to LLCs, to the extent the act is not inconsistent with the common law of agency, the latter still applies.

■ And it is the universal law of agency that when an agent acts with authority in a transaction with a third party, and the third party is aware of the agency, the transaction is between the principal and the third party. *See Restatement (Third) Of Agency* § 6.01 (2006). In such circumstances, the agent is not liable. *Id.* The agent of a business entity (or any agent, for that matter) can be personally liable only when he or she purports to be an agent but actually acts without authority. When that happens, responsibility for the transaction falls back to the agent and does not bind the principal. Thus, when acting in the .capacity of an agent for the LLC, Shannon could only be personally liable if she acted without authority. Otherwise, the contract in question was between the principal (the LLC) and the third party (Pannell), and Shannon had no personal liability for the agreement.

Pannell, of course, argues that Shannon lacked the authority to act on behalf of the LLC because there was no LLC in existence at the time the release and second lease were entered into. Pannell also ar-

---

**20.** Under the present version of the statute, the agency analysis appears to be much simpler, as it now states that the liability of an agent for acts during a period of dissolution "shall be determined as if the administrative dissolution or revocation had never occurred." KRS 14A.7-030(3)(c).

**21.** Arguably, the Limited Liability Company Act expressly incorporates many aspects of the law of agency. *See, e.g.*, KRS 275.095 ("All persons ... who assume to act for a limited liability company without authority to do so ... shall be jointly and severally liable for all liabilities created while so acting."). While this provision of KRS 275.095 was added to the statutes after the events in this case, its addition "[c]onfirm[ed] the common law of agency." Thomas E. Rutledge, *The 2007 Amendments to the Kentucky Business Entity Statutes*, 97 Ky. L.J. 229, 260 (2009). While there is no doubt that the common law of

agency applies to LLCs, any suggestion that this provision creates additional liability is questionable as applied to a dissolved LLC, since the amendment to KRS 275.095 is under the heading "Joint and several liability for knowingly purporting to act for nonexistent organization," and a dissolved LLC continues to exist during dissolutions until wound up.

And traditionally, such language was only intended to address pre-organization actions. *See, e.g.*, Wilburt D. Ham, *Corporations*, 63 Ky. L.J. 739, 745 n. 31 (1974–1975) ("the words ... 'without authority so to do' presumably have reference to the existence of a certificate of incorporation"). Such language previously appeared in the corporation statute and has since been replaced by language expressly addressing liability ' for pre-incorporation acts. That the LLC statute has both forms of language suggests redundancy rather than intent to broaden liability.

gues that the effect-of-dissolution statute, KRS 275.300, limits a dissolved LLC to winding up its business and prohibits "any other business," KRS 275.300(2), which in turn bars an agent from doing such other business.

This line of reasoning is one argument for why *Forleo* reached the correct result,[22] since the defendants in that case, in addition to being shareholders, were also officers and therefore agents of the corporation. After noting that changes to the Kentucky Business Corporation Act would undermine *Forleo* going forward, one critic, Thomas Rutledge, has argued that *Forleo* was nevertheless correct because officers and agents of a corporation conducting business during a period of dissolution act without authority, either because the corporation "lacked the capacity to appoint an agent to engage in activities other than for that limited scope [winding up]," or because "to the extent that the agents sought to bind the principal on a transaction upon which the principal could not at law be bound, those same agents will have exceeded the scope of the delegated authority and may as well have violated their warranty of authority." Thomas E. Rutledge, *The 2007 Amendments to the Kentucky Business Entity Statutes*, 97 Ky. L.J. 229, 243 n. 95 (2009). This argument, however, depends on the false assumption that a corporation or LLC ceases to exist during a period of dissolution.

*See id.* ("Unless the third party agrees otherwise, a person who makes a contract with a third party purportedly as an agent on behalf of a principal becomes a party to the contract if the purported agent knows or has reason to know that the purported principal does not exist or lacks capacity to be a party to a contract." (quoting *Restatement (Third) of Agency* § 6.04 (2006))).

Indeed, that this approach depends on the non-existence of the business entity is shown by the *Restatement's* claim that "[t]he classic instance of this situation arises when a person enters into a contract purportedly on behalf of an entity that has not yet been formed, such as a business or a not-for-profit corporation or a limited-liability company." *Restatement (Third) of Agency* § 6.04 cmt. c (2006). Obviously, that is not the case here because Shannon's company had been organized.

Of course, "[s]imilar questions arise when a person purports to take action on behalf of an entity . . . when the entity has been dissolved." *Id.* In such instances, "[t]he organizational statute applicable to the entity may specify the circumstances under which such action will result in individual liability to third parties." *Id.* For example, the *Restatement* offers an illustration in which a business entity is dissolved and, under the applicable statutes, "the effect of the dissolution . . . is to terminate [the entity's] existence." *Id.*

---

22. Another, better argument for why *Forleo* was correctly decided is that the reinstatement in that case occurred after judgment had been rendered by the trial court and the rights of the parties, therefore, were decided. Indeed, several of the cases cited by Pannell, such as *Daniels v. Elks Club of Hartford*, 192 Vt. 114, 58 A.3d 925 (2012), involved post-judgment reinstatements. Pannell claims there is no real distinction between pre- and post-judgment reinstatement, and notes that the reinstatement here came after litigation began, which, he argues, should be the dividing line. But a court judgment is an important distinction, a proper dividing line, as it decides the dispute between the parties. Once the rights of the parties have been finally decided, reinstatement cannot undo that decision. There is a strong preference for finality of judgments. Additionally, the equitable remedy of laches could support the result in *Forleo*. In fact, the Limited Liability Company Act specifically states that "[u]nless displaced by particular provisions of this chapter, the principles of law and equity shall supplement this chapter." KRS 275.003(1).

This would create individual liability absent law providing otherwise. *Id.* And Pannell argues that the LLC did not exist in this case because of its dissolution.

But under Kentucky law, a "dissolved limited liability company shall continue its existence." KRS 275.300(2). So Shannon's authority did not cease to exist for lack of a principal because Elegant Interiors, LLC continued to exist as a matter of statutory law.

Pannell suggests that KRS 275.300 creates another limit on Shannon's authority as an agent because the statute forbids the LLC and any erstwhile agent from doing any acts other than those necessary for winding up. By extension, this would mean that by command of the legislature, Shannon had no authority to engage in continuing business while the LLC was dissolved. This, of course, cannot be literally true because seeking reinstatement, which is clearly allowed, is not part of winding up.

More importantly, the retroactive effect of the reinstatement, which as noted above creates a seamless existence and functionality for the LLC, means there was never a failure of Shannon's authority. She was both a member and an agent of the LLC, and the reinstatement requires us to treat the LLC as though it existed the entire time. If the company never ceased to exist, and its full "corporate" powers are retroactive to the dissolution date, so too is the authority of its agent. Thus, the limits in KRS 275.300 had no applicability, since the LLC was, in fact, reinstated and had a continuous existence.[23] Because the agent's acts bind the company, they are acts of the company, and not the agent. And, as noted above, the agent cannot be liable for acts of the company. Shannon, therefore, cannot be liable as an agent, as her authority never lapsed.

▮ In a sense, the reinstatement was a kind of statutory ratification of Shannon's acts on behalf of the company. Ratification "supplies original authority to do the act." *Kindred Nursing Centers Ltd. Partnership v. Leffew,* 398 S.W.3d 463, 467–68 (Ky.App.2013) (quoting *Capurso v. Johnson,* 248 S.W.2d 908, 910 (Ky.1952)); *see also Restatement (Third) of Agency* § 4.02(1) (2006) (ratification "retroactively creates the effects of actual authority").

23. Though they do not directly answer the question in this case, because they largely apply only when an LLC is winding up, other statutes demonstrate that KRS 275.300 alone cannot mean that Shannon lacked the authority to continue her business. Those other statutes expressly contemplate that non-winding-up acts will occur during dissolution but will bind the company. KRS 275.305, for example, specifically states that a limited liability company is bound by acts of "each member or manager having authority to wind up the limited liability company's business and affairs" that are "appropriate for winding up the limited liability company's affairs." KRS 275.305(1)(a). That statute also binds the LLC to *"any other act that would have bound the limited liability company if it had not been dissolved,* if the other party to the transaction did not have notice of the dissolution." KRS 275.305(*l*)(b) (emphasis added).

This undermines any claim that KRS 275.300 absolutely limits a company to winding up during dissolution, as it expressly allows the company to be bound at that time. Of course, Pannell could argue that this statute suggests that the agent's non-winding-up actions are not binding on the LLC because statute also states that "the filing of a certificate of dissolution ... shall be presumed to constitute notice of dissolution for purposes of subsection (*l*)(b) of this section." KRS 275.305(2). If this statute were the only one at issue, then Pannell might be correct. But we cite it only for the proposition that KRS 275.300 does not absolutely limit a dissolved company's powers. Ultimately, this statute does not control the outcome here because the LLC was actually reinstated and was not wound up, and this statute only dictates what happens when a company is dissolved and wound up.

And ratification "relates back" to the time the transaction was entered into. *Leffew*, 398 S.W.3d at 468. Again, the LLC statutes anticipate that the LLC can ratify an agent's acts during a period of dissolution, thereby making the acts those of the LLC. Specifically, KRS 275.305(3) states that "[a]n act of a member or manager which is not binding on the limited liability company pursuant to subsection (1) of this section [which makes a member's non-winding-up actions binding in certain circumstances] shall be binding if it is otherwise authorized by the limited liability company."

Reinstatement, however, is superior to traditional ratification. Ordinarily, ratification occurs either through "manifesting assent" or "conduct that justifies a reasonable assumption that the person so consents." *Restatement (Third) Of Agency* § 4.01(2) (2006). And "whether conduct is sufficient to indicate consent" to ratification "is a question of fact," *id.* § 4.01 cmt. d, which would require a jury finding. But as discussed above that the company never ceased to exist is a result of statute—a matter of law—and the effect of reinstatement is that the company's continued existence is as though there was never dissolution. If there was never dissolution, then there was never a lapse in Shannon's authority that would require traditional ratification.

Pannell complains in his brief that that the reinstatement occurred only after he filed suit and suggests that our reading of the statute has an inequitable effect. But it is not entirely clear how this reading is unfair to Pannell, except as viewed after the fact when it is clear that the LLC has no assets. But what if the circumstances were reversed, and the LLC still had assets but Shannon did not? Under Pannell's proffered reading of the statutory scheme, he would have to settle for suing Shannon because the acts were hers and not the LLC's.

The equities should be viewed from before the fact, at the time of the transaction, not after the fact once litigation is anticipated or begun. If Pannell had no notice of the dissolution and entered into the lease specifically with the LLC, then he cannot claim he is harmed or loses some bargain if the LLC is later reinstated and its agent's action are legally imputed to it. Pannell will have gotten all that he expected at the time of the transaction, including any risk and any benefit. It is only after the fact, after seeing what has happened with the LLC and seeing the risk manifest into reality, that he appears to be harmed.

The simple fact is that reinstatement is between the LLC and the state. Indeed, the primary purpose of requiring business entities to file annual reports and to pay a filing fee is "the raising of revenue for the State." *Fairbanks Arctic Blind Co. v. Prather & Associates, Inc.*, 198 S.W.3d 143, 144 (Ky.App.2005) (quoting *J.B. Wolfe, Inc. v. Salkind*, 3 N.J. 312, 70 A.2d 72, 76 (1949)). Indeed, the filing fees were once called a "franchise tax." Any inequity would actually be in permitting Pannell to use the temporary faltering of the relationship between the LLC and the state to his advantage when he has no interest in that relationship. *Cf. id.* at 144–45 He cannot be allowed to take advantage of the LLC's failure to file its report and pay what amounts to a tax to bypass the LLC and hold its owners or agents liable, at least not once the failures have been remedied. *Cf. id.*

### III. Conclusion

Shannon did not sign the second lease in her personal capacity, and thus liability cannot be assigned directly to her, bypassing the limited liability company in this case. Additionally, that the limited liabili-

ty company was dissolved when the transactions in this case occurred cannot make Shannon personally liable solely by reason of her having been a member or agent of the company, because the reinstatement of the company was retroactive to the time of dissolution, thus giving the company (and any resulting immunity) a seamless existence. Finally, reinstatement resolves any question about whether Shannon had authority to act as an agent for the company during the period of dissolution because the reinstatement is effective to the date of dissolution, which means that, legally speaking, there was never a lapse in the company's existence and thus never a lapse in Shannon's authority. For these reasons, this Court concludes that the trial court properly granted summary judgment in favor of Shannon, albeit for different reasons, and thus the Court of Appeals' decision affirming it was correct. The judgment of the Court of Appeals is thus affirmed.

All sitting. All concur.